We'll hear argument this morning in Case 22-381, Giegazaryan v. Smagin. Mr. Levy? Mr. Chief Justice, and may it please the Court, in RJR Nabisco, the Court held that private plaintiffs may sue under civil RICO for trouble damages if they suffer a domestic injury. Considering the plain text, the Court's precedents, and the common law, it is clear that a civil RICO plaintiff is injured at its domicile. This makes sense. Congress legislated to address domestic concerns and to protect U.S. persons, and this bright-line rule ensures that U.S. domicile plaintiffs will have a right to sue under RICO. And as a matter of comedy, it avoids interference with the remedial schemes of foreign states. In response, Mr. Smagin appears to propose a variant on the Ninth Circuit Gestalt test, which considered the conduct of one of the 12 defendants in this suit and the situs of the plaintiff's property. But RJR already held that the focus of RICO's private right of action is the plaintiff's injury and not the defendant's conduct, and that perhaps that is why Smagin here wishes to have the Court overrule RJR Nabisco. As far as the focus on the plaintiff's property, the statute, again, focuses on an injury to the person, not the property, and regardless, the common law instructs that the nature of the property here being intangible, it's a judgment and a debt, it follows the person of the plaintiff creditor, and that is where it is located. So the injury here was in Russia and not the United States. Following the common law makes sense because it avoids the odd result of allowing a foreign plaintiff to bring a foreign judgment or award to the United States to create a domestic injury. Finally, it is clear that the decision below will be unworkable. The Ninth Circuit purported to apply the same test as the Third Circuit, and yet those two circuits split on nearly identical facts in Sevdet and the decision below, and adopting the Ninth Circuit's approach will only generate more splits, considering the scores of conduct and predicates that allow a claim under RICO and the categories of intangible property. This is not what RJR Nabisco intended. The Court should reverse the decision below. I welcome the Court's questions. Mr. Levy, you seem to, in your brief and in your opening statement, argue that all property, injury involving all property, the injury accrues at the domicile of the party. How would you deal with real property using your approach? Right. So our first argument, based on the text of the statute, is that the harm is felt at the domicile of the plaintiff. No matter where the real property is? That's right. And our secondary argument— Isn't that kind of odd? Well, it's what Congress intended, and it's rooted in the text of the statute, where it protects injuries to the person of the plaintiff and allows the person of the plaintiff to sue for three-fold as damages if injured. And in the case of Chattanooga Foundry, which was decided soon after the enactment of the Sherman Act— Chattanooga Foundry in the early 1900s— Justice Holmes, per the Court, wrote that we do not go behind the person of the plaintiff. And that principle wasn't—is probative, not just because it is close in time. Perhaps the words, in versus to, seem foreign to us today, but it was interpreted at the time. So do we have to decide that all property, the injury accrues at the domicile, as opposed to just, in this case, we're dealing with intangible property? I think the Court could decide the case on narrow grounds and to say that— could leave open the question of whether harm to tangible property is felt is a sufficient basis to proceed. But I do think the Court should look to the text of the statute, which directs it to the person of the plaintiff. And in the event the Court does look at property, of course, we're dealing here with intangible property. A judgment is a debt, as the Court recognized recently in the context of the Bankruptcy Act, just this term. And as the common law instructs, a debt follows the person of the creditor. Well, here we—the plaintiff obtained a California judgment to collect California property against someone living in California based on conduct in California, right? There is a California judgment recognizing an award rendered abroad. Why can't we consider with all those connections that that's a domestic injury? Well, there's no law that supports the notion that that judgment exists in California or in the United States. The common law has long looked at intangibles as following the person of the creditor. Blodgett makes the point in 1928, and the principle goes back to Justice Story's commentaries, that a property right that is intangible, such as a debt, follows the creditor. And it does not matter that the debt can be enforced in California, which is the case here. I would add, of course, that the judgment here is movable from California and can be recognized not just across the United States under the full faith in credit clause, but across the world. And indeed, the judgment in this case recognizes an award, and that was recognized under the New York Convention, and that was also recognized in Lichtenstein. But the individual can also move around the world, right? Yes. So how is that different when you suggest that the judgment can move around the world? Well, that's exactly the point with intangible property rights. There's no one place where they're located. I should add that the first—we're basing our rule on not just the commentaries of Justice Story and the Court's longstanding instructions as to how to cite property rights. The injury here is a failure to pay. That was felt at Mr. Smagin's wallet in Russia. And a judgment, a debt, a bond, that's an intangible right. It's cited at the domicile of the creditor for purposes of taxation, for purposes of achievement, and for all purposes, for enforcement purposes, too. The creditor brings it with him to the location where the judgment can be enforced. And, of course, the law does not require that there be personal jurisdiction to enforce a judgment of the United States. Some courts in New York and California—we cite them in our brief—have allowed a plaintiff to proceed with judgment enforcement in the absence of any jurisdictional requirements. And, of course, Schaeffer itself, in Footnote 36, states that personal jurisdiction doesn't apply in the enforcement proceedings. Can I ask a question about your statement that the judgment is occurring, or is the injury to pay? I guess I'm—or, excuse me, the injury is the failure to pay, which is what I think you said. But what about all of the activities that were allegedly taken in this case here in the United States to avoid enforcement of the judgment? Are you saying that's not part of the injury? Well, I think that's the defendant's conduct. And so our first response is that it is not part of the injury. The injury is what's felt by the plaintiff. And so RJR—the focus of the statute under RJR is the injury. But why isn't that felt by the plaintiff here? Well, it's felt by the plaintiff where he's domiciled. That's what the common law instructs. And that is in Moscow. And that's what RJR—you took RJR to carry forward that principle, that the injury is directed to the person? No. RJR instructs that the court should look at whether there's a domestic injury. And to identify where that injury takes place, we look first at the text of the statute, as the court usually does, and we look at the common law, including prior—and to the precedence of this Court interpreting the text that was adopted by Congress in 1970 when it enacted RICO. And you said—but you—the common law that you're focusing on is the Chattanooga case? No. Chattanooga we're focusing on to interpret the words of the statute. The common law—we look at two sources of the common law. One is common law conflict rules, as reflected in the first restatement. And the reason we look at those is because the common law looked to the situs of an injury to determine which law applied and had a rule for determining where an economic injury occurred. And for that reason, we look to the first restatement rule, which was the majority rule at the time of RICO's enactment. We also look at the common law citing intangible property rights. That's reflected in Justice Story. That's reflected in some of the enforcement cases that the court looked at. Chicago Rail v. Storm. Harris v. Balk. All right. So, Justice Thomas raises the point of what about tangible property rights? So, are you prepared to concede that you might have a different outcome with respect to a foreign plaintiff who has both property—tangible property interests and intangible property interests that are put at risk through racketeering activity? Well, our primary argument is—our first argument, based on the text, is that the result is the same for tangible or intangible property. You look to the plaintiff and where the plaintiff is, because the statute speaks of injury to the person or the plaintiff, and he may recover threefold his damages. So, what about a U.S. plaintiff, a U.S. citizen plaintiff who is residing overseas, but everything related to the property interests, the business interests, the activities all happen in the United States? Your position is still we have no domestic injury if that person is residing in London, for example. Yes. It depends on the nature of the property right, but— But I thought you said it didn't. Your first-line injury wasn't—it didn't matter what the property right is. Right. Yes. That's right. Our first argument is it doesn't matter. Your first argument is it doesn't matter. I'm talking about a U.S. citizen who has business interests here, real estate here, money interests here, and for whatever reason is residing in London at the time the United States. Your answer is no domestic injury. If his domicile is London, unless he's undertaking substantial business activities, we allow that that may be a possibility. Yes. Our primary argument is that there's no domestic injury. When you say primary argument, are you making a first argument and then saying even if we lose on the first argument, we have an alternative argument? That's correct. Our first argument is the injury is to the person and not the property. Okay. That's our first argument. If we lose on that as to tangible property, you're still arguing as to intangible property, that's the rule. That's right. Okay. Counsel, I have a basic problem, which is as I was reading your brief and thinking about this case, you keep talking about domestic injury. And I was trying to figure out where you got that from, and I then went back to RJR, of which I wasn't the party. I was recused. And as I see the word domestic injury there, it was shorthand for the second step of the extraterritoriality analysis the court adopted, don't you? I think domestic injury was shorthand for... The second step of the two-step inquiry. For the holding at the second step that the focus of the statute is domestic injury. Exactly. But the court wasn't looking at the plaintiff. It was... And in fact, it said and didn't say explicitly that foreigners couldn't sue. What it said was that step two determines, and I'm quoting it, whether the case involves a  And the word it uses, if the conduct relevant to the statute's focus occurred in the U.S., then the case involves a permissible domestic application, even if other conduct occurred abroad. So you seem to be thinking that injury is the conduct. I think of injury as the focus of the statute of what conduct and where was it done that would violate the act. And so that's a big difference for me. And that goes to the Chief's questions and Justice Jackson's question that here all of the... Whether they can prove it or not, different question. But the evasion of the judgment was in California. The claims are that all of the activities to evade the judgment were directed from or took place from California, and that the judgment is in California. So tell me why those aren't the acts that constitute the RICO conspiracy at issue here. So first, the second step, what matters is the focus of the statute. It doesn't have to be conduct, and I think the court made that clear in part four. And the injury is an element of the claim, which is known as common law, and it's felt by the plaintiff. But the problem is that we're not talking about whether every element was committed in the United States. If that were the case, then we would have said if any conduct occurred abroad, it would be irrelevant. And we definitely didn't say that. We said some conduct can be abroad, some can be here. What you need is that there's enough here to constitute conduct in the United States. So I'm not sure where you get that every element of the crime has to be done in the United States. If I misspoke, I apologize. No, no. But so even assuming that there's economic loss felt somewhere else, and that has to be proven, why can't the other elements of RICO occur in the U.S.? So certainly some of the conduct can be here or abroad, and that's part three of Nabisco, which spoke of the substantive reach of RICO. And in part four, the court said as a separate matter, there needs to be a domestic injury, because that is the focus of the civil RICO provision. And the presumption against extraterritoriality was not overcome. And foreign states- So why isn't, let me go to one last question. Why isn't a judgment, a California judgment, held in California? Well, I- Like real property. Why doesn't it belong in the U.S.? Well, all the cases speak of a judgment as a debt, and it's held at the domicile and by the plaintiff. And in fact, the first restatement considered locating the judgment at the court issuing it. It's in the drafts. And that was never adopted. And Professor Samowitz goes through the history of the first restatement. It was something that was considered. It was not adopted in the first restatement. And we're aware of no case in which a court has said, and they cite none, that the judgment is at the issuing court. That's not the common law rule. I did want to say, although our view is that in RJR, that RJR instructs that the conduct is irrelevant and that it's the injury that matters. We don't accept the premise that everything occurred in the United States or even that it was directed to the United States. If the court looks at paragraph 91 of the joint appendix, it will see that there are a number of allegations that focus on activities abroad, litigation in Nevis, litigation in Lichtenstein, enforcement activities related to the Lichtenstein judgment, efforts to move assets from London to Lichtenstein. I'm going to stop you there because I don't disagree that there's a lot of foreign conduct alleged. And whether any of it is actionable or not in a RICO claim here is not before us. I think what's before us is whether the alleged U.S. conduct was enough under RICO. So thank you. Counsel, can I ask you why you focus so much on the first restatement when the second restatement was adopted before RICO was passed? And the second restatement marked kind of a sea change in the way that we think about conflicts of laws, in particular a multi-factor test that's more similar to the one proposed by your friend on the other side. So why should we care about the first restatement? So a few reasons. One, as Beck instructs, the court should look at the common law at the time of RICO's enactment, which here is 1970. The second restatement was passed or came into formal form in 1972, I believe. But it's purporting, right? The whole point of the restatement is it's trying to describe what the law was, which isn't photo finish at the moment. It's published in 1972. There's some lag time, right? So it seems to me that the second restatement would be a pretty accurate statement of what the law was right around that time. So I think with respect in particular to that restatement, it was aspirational. And I would cite Justice Scalia's separate opinion in Kansas versus Nebraska, 574 U.S. at 475. And he notes that restatements moved from restatements of the law, as the first restatement was, to becoming more aspirational. I think it's undisputed that the first restatement rule was still followed by a majority of states through 1979, which is after RICO was enacted. And the more substantive point, of course, is we're not actually conducting a choice of law analysis. Our position is that the court should look to the restatement rules to determine where the injury was found and where it occurred. The second restatement did not adopt a different rule to do that. What it did is, as Justice Barrett, as you said, add other elements and looked at the center of gravity. I think the ALI was doing something more aspirational, was kind of your argument. It was pushing for a change, not existing. Well, it's two points. One, it is pushing for a change. And the other point is, we're looking to the restatement rules to identify the location of the injury. And the second restatement, although it was aspirational, did not change the rule for determining where the injury occurred. Is it true, though, that even before the second restatement was adopted, that a number of states had abandoned the first restatement and had adopted something more like the second, including, incidentally, California? I think some states had transitioned. The majority of states at the time, as I said, 1979, is undisputed, still adopted the rule. And then, when we think about extraterritoriality, really, we're thinking about comedy. And ensuring that our laws don't interfere with other countries' laws. And that there's, as a result, we hope, won't interfere with ours. And I certainly understand the argument that RICO has potential comedy impacts, especially when you're thinking about conduct abroad and suing defendants abroad. But here, the question is whether foreign plaintiffs can have the same opportunities as domestic plaintiffs. Which would seem to be not a comedy problem. And in fact, if there were a comedy issue, it might be by denying access to our courts for domestic persons. So what do you say to that? And related to that, it's notable that the US government, which has grave interests in comedy and extraterritorial application of our laws for just these reasons, chose not to participate in this case. So, there you go. Two balls in the air for you. Okay, I'll try to remember them. Number one, the court has made clear that the presumption is a different canon of interpretation than the canon against considering prescriptive comedy. Justice Scalia made that very clear in his dissent in Hartford Fire. And the court has made that clear for the court as a whole, including in IRJR, where that it was applying the presumption as a matter of interpreting the statute wholly apart from comedy. The second point, which is, we do rely on comedy. Before we leave that one, why isn't our extraterritoriality rule essentially a crystallization and a shorthand for comedy considerations? I think the court hasn't thought about it that way and has considered the presumption to be a longstanding canon of construction. It certainly reflects some principles coming from comedy concerns in international law. But I think the court has also considered that the canon of or the prescriptive comedy concept will apply independently. So, they're both independent. As far as the application of comedy to this case, I think that blame was made by the court in RJR, which looked at the comedy concerns and said that there are independent concerns arising, not just from applying our laws to conduct occurring overseas, but also to allowing foreign plaintiffs to sue. And there's that footnote reserving the very question in this case, though, right? So, I mean, you talk about overruling RJR, but I don't know about that, given that footnote seems to reserve this very question, which is why we have a circuit split on it, which is why we're here. Right. I think there are aspects that are sought to be overruled here, including what the court's ruling on the focus. If Justice Gorsuch, if you were referring to that. I understand that, but the person, the plaintiff issue is open, right? The question of what, where the injury is, is open. That was not briefed or addressed and left open, and it was conceded there that the injury was foreign, even though it was, it consisted of lost revenues and much of the activity occurred here. The dissent noted that the case had the United States written all over it. That didn't change anything. What happens, in your view, if the plaintiff is domiciled in the United States, but all the relevant conduct is abroad? If the plaintiff is domiciled in the United States, then he or she passes the 1964C requirement of having a domestic injury. And as far as whether the conduct is within the scope of RICO, that turns on whether the substantive provisions apply extraterritorially. Right, so it's assuming that they do, so that the substantive provisions would apply. But then you're saying that the right of action can also kick in, even though everything was done abroad, and the only connection with the United States is that the plaintiff is domiciled here. Right. That's because Congress made a judgment call that the substantive scope of RICO would apply extraterritorially. I think the court was unanimous on that point in RJR. And the issue of whether it's a domestic injury comes in as a separate matter, because the court ruled that the presumption applies separately to section 1964C and required domestic injury. So it's a separate check that a plaintiff has to go through under civil RICO in light of the court's instructions in RJR Nabisco. Again, recognizing that providing a remedy raises wholly distinct issues. Also recognizing that the right of action could be and was narrower than the substantive scope of RICO. And the court did this analysis in RJR. In the RJR case, didn't the court also say that we had a context-specific kind of dynamic working here? I think the thing that is confusing me a little bit about your argument is that it seems as though you are advocating a bright-line rule, when in RJR the court suggested that application of the domestic injury rule will not always be self-evident, that it depends on the context. So how do you square that suggestion with your test? So I think there are two points. One, I read that part of RJR to leave open the question of where the domestic injury is. It doesn't open or shut the door to a bright-line rule. The court has said, including in RJR, that it prefers bright-line rules in this context. That Congress is, of course, free to overrule the court by statute, as, for example, it did in Aramco, following Aramco. But if, Justice Jackson, if you look at the discussion in RJR of the comedy concerns, and of course the plaintiffs there were foreign states and the European community, and they were saying that they know better whether their sovereign interests were at play. And the court said, well, we have to apply a rule and find a rule that governs in all cases, and rejected the notion that there ought to be case-by-case adjudication of whether the presumption is overcome. So that's where we're finding a home for the bright-line rule. What specifically was the intangible asset that was the basis for the Ninth Circuit's decision here? The Ninth Circuit said that the key was the judgment. Has any other court addressed that issue? Of whether, well, in SEFDAT, the Third Circuit looked at basically the same facts. There was a judgment that was unpaid, it was here, and it came out the other way. But I think the other point is adopting a more open-ended approach here will, as I said, lead to a number of circuit splits considering not just the nature of the conduct and the nature of the injury that may result, if it's accepted that a property interest can be injured in some other way, but also whether a property right is tangible or intangible, which is a question of law. In Baskunia, in the Second Circuit, for example, held that funds in a New York account, and this is the Second Circuit, were a tangible form of property and therefore were there. And this directly contravenes what this court said in Blodgett, that funds in a bank account create a claim against the bank, which is a chosen action, and an intangible. And this is just one example. Thank you, Counsel. Justice Thomas? So in your argument, then, the debt is the intangible property? The right to payment is the intangible property, which is the debt, yes. Okay. So why not the judgment? Well, the judgment is a debt, so the, but the judgment... The judgment is a debt. I thought the debt was not being paid, so you sought a judgment in the Central District of California. Right. It's hard to distinguish them, of course, because there's a judgment in Lichtenstein, which reflects the same award. So I think the judgment, there are a number of debts that are won the same, but the judgment creates a debt. What was the initial judgment for the debt? Was it in the Central District of California? No, it was initially an arbitral award rendered in London. That's right. That was brought to the United States. So that is the debt. That is the initial debt, but the judgment, of course, recognizes it and exists independently and can be brought. So if you have one debt in Lichtenstein and one in the Central District of California, how many debts do you have? Well, you can only collect on those once. Well, so then they both can't be debts. Well, I think the law looks at all of them as debts, but you can only collect on them once. And the initial debt is the award in this case. That's my point. The debt is actually the award, and it seems as though what you're talking about, what we keep referring to as a judgment, is a way to collect on a debt in the United States. So I don't know how that could be a debt. Right. The common law in the Court do say that a judgment itself is a debt. A judgment or the judgment? Well, a judgment. Yeah. Justice Alito? Justice Sotomayor? I just am a bit confused about the issue that we're addressing. I think the question presented was, has plaintiff stated a valid RICO claim? Now, assuming, don't panic, but just assuming, we believe that they might have with respect to Yager-Zarian, in my mind there's a question about the other defendants, like CMB Monaco, that's not alleged to have done anything directly in the United States. What do we do with that? Is that the subject of a different motion that the respondents have to make in the Court below? I think our first argument is that you don't look at conduct at all. But if the Court looks at conduct, and there are certainly different conduct alleges to different defendants, here, I think for all the defendants, including Mr. Yager-Zarian, the primary conduct was outside the United States. I know what your argument is. Right. And then in terms of disposition. We have to do, in terms of our disposition, do we just say what we say and let the Court sort it out on which defendants belong in this action and which don't? Well, I think if the Court announces a rule that is similar to the Ninth Circuit, then it ought to apply it to give guidance and to say that there isn't enough conduct here. But alternatively, it would have to remand, I suppose, because there was no defendant-by-net defendant analysis. Thank you, counsel. Justice Kagan? Justice Kavanaugh? Justice Jackson? I'm sorry. Justice Barrett, I'm jumping ahead. Justice Jackson. Thank you, counsel. Mr. Kennedy? Mr. Chief Justice, and may it please the Court, Mr. Smoggin states a RICO claim because he alleged injury to his California property from California action that violates RICO. RJR Nabisco teaches us that a domestic injury is one that arises in the United States. This looks at the location of the injurious conduct and the location of the injured property. This case is deeply domestic on both fronts. First, the conduct. The RICO violations occurred in California. The scheme was orchestrated by an international fugitive living in Beverly Hills. Second, the property. This RICO enterprise targets a California judgment against California debtors that confers rights only in California. Petitioners' attempt to escape RICO liability simply because their victim lives abroad should fail for two reasons. First, the text. Section 1964C allows any person injured in their business or property to bring a civil RICO claim. Petitioners ask you to rewrite the statute to apply only to domestic persons. Congress knows how to limit those who can bring a statutory claim to domestic persons, but Congress chose not to do so here. Second, the context. Petitioners' singular focus on the domicile of the plaintiff ignores the genesis of the domestic injury rule. For a civil RICO claim, domestic injury is step two of the extraterritoriality analysis. This is conduct focused. A conduct focus allows the U.S. court to address U.S. conduct by U.S. defendants targeting U.S. property. Petitioners' rule, on the other hand, would allow a U.S. court to regulate purely foreign conduct just because the plaintiff happened to live in the U.S. This regulation of purely foreign conduct is exactly what the presumption against extraterritoriality seeks to prevent. Congress did not bar the courtroom to foreign RICO plaintiffs, and this court should not do so either. The opinion below should be affirmed, and I welcome the court's questions. Mr. What is the property here? You heard my question to your friend on the other side. Is it the judgment in the Central District of California, or is it the arbitral award? And if it is the judgment in California, why isn't it also the $90 million judgment in Liechtenstein? Thank you, Your Honor. The property here is the California judgment issued by the U.S. District Court for the Central District of California. The reason it is not the additional London award or an additional judgment in a different country is twofold. One, the California judgment confers rights only in California issued by a California court. Two, the California judgment was issued after the original act. The RICO claim is based entirely on acts that occurred after the arbitration award was issued. Completely different actions, completely different liability we're seeking here. We're not going back to anything that happened before the award, and we're not doing anything that led to the original award. It is a little bit odd, though, isn't it, Mr. Kennedy, that this whole, yes, there's a California judgment and acts, alleged acts taken to avoid that judgment, but all of that is derivative on a dispute that was fundamentally foreign in nature between foreign parties involving foreign conduct, have initially adjudicated in another foreign country. So the fact that this has migrated, if you will, to the United States, you know, comes about only with respect to enforcing the first judgment. You're correct, Your Honor, that the original arbitration award was the genesis of a, came from a foreign dispute. But that's not dispositive here for two reasons. First, Mr. Yeghezarian moved to California and has lived in California enjoying the benefits and the protections of U.S. law for over a decade. Second, the arbitration award was confirmed into a U.S. judgment under the New York Convention, which teaches us that a judgment confirming an arbitration award must be treated the same as any other judgment. When that judgment is issued, the arbitration award, at least for purposes of the U.S., seeks to exist, ceases to exist in a new U.S. judgment. And so suppose there was no other conduct in the United States of the kinds that you have alleged, that the only U.S. connection is the, let's say, California judgment itself. You know, whatever steps taken to avoid that judgment, suppose they were all overseas as well. Would you still have a claim? I don't believe we would, Your Honor, because RJR Nabisco teaches us that it must be conduct-focused. The conduct that is the focus of the statute must occur in the U.S. Here it did. We have a California debtor who orchestrated this scheme from California, intimidated witnesses in California, signed false documents from California, transferred money from California. So your theory is not based on the judgment alone, but based on the judgment plus the conduct intended to avoid it. I would actually flip it, Your Honor. I would say it's based on the conduct primarily informed by the location and nature of the property, which in this case is the California judgment. And then doesn't that run into some of what we said in RJR, that it really was a property-focused test rather than a conduct-focused one? And I'm not suggesting that RJR precludes looking at conduct at all, but doesn't RJR indicate that the primary focus is on property rather than conduct? I believe RJR focuses on both, as does the text. RJR applied the presumption against extraterritoriality, just as Morrison did, just as Keogh Bell did. That's always been conduct-focused. But RJR recognized that Section 1964C is different. That's where the domestic injury piece, that's where the property gloss, if you will, on it came in. And that's to be faithful to the statutory text. The text says injury in business or property. It doesn't say, as my friend on the other side said, injuries to the person. It says injuries in business or property. That's why we take the emphasis on property is appropriate when doing an extraterritoriality analysis under 1964C. Well, it doesn't say injury in or injury to. It says a person injured in his business or property. That's correct, Your Honor. We believe each of those words should have meaning. It says any person. That defines, as I believe petitioners pointed out in their reply, the beginning category. Any person, not any domestic person. It then qualifies that by saying injuries in business or property. What that tells us, and if we look at the legislative history, that tells us RICO is not focused on personal injuries. It's not focused on assaults or murders. It's focused on economic injury. That's why we use the terms injury in business or property in the statute. And, again, ignoring those terms and looking only at a level of abstraction only to the plaintiff and where they diminish their overall wealth writes those two terms, business or property, out of the statute. The petitioner draws a distinction between injury to property and injury in property. What do you say to that? Yes, Your Honor. That distinction came from the Chattanooga case. Right. Do you agree? Do you want us to read in property to mean to property? I don't, Your Honor. I don't think that there may be a distinction. Chattanooga found a distinction in the context of the specific Tennessee state statute of limitations, which used the phrase injury to property along with conversion and distinction. Essentially, it found in that case that statute of limitations was looking at a narrower type of injury. That distinction, if it is one, doesn't matter here. We're talking about injury suffered in property, injury to property, however you want to phrase it. Again, the Chattanooga case didn't look at where injuries were felt. It didn't look at the nature of injury. It only looked at a state statute of limitations. Could you say succinctly what legal test you would like us to adopt? Absolutely. A domestic injury is one that arises in the United States, one that focuses primarily on the location of the conduct that is the statute's focus. It is informed by the location of the property injured. That is the exact same test that was set forth in RGR Nabisco when looking at extraterritoriality, and it's the test this Court has used consistently, Keogh, Bell, Nestle, going back to Morrison, looking at the statute that is the – So conduct is the main thing. Conduct is the main thing, just as it's always been in presumption against extraterritoriality cases, conduct that is the focus of the statute. Some relevant conduct in the U.S. is enough, even if there is additional foreign conduct. So if there was conduct without the judgment, would you still win? In our case, we believe there is sufficient domestic conduct that would allow the – that would establish domestic injury and allow the presumption against extraterritoriality to be overcome for this claim. Where would the domestic injury be in that scenario? Well, it would depend on what the property is, Your Honor. You can't divorce injury. If there's no California judgment, was Justice Alito's question, so where would the domestic injury be there? The injury would be primarily where the injurious acts occur. You can't divorce the acts causing injury from injury itself. And again, that's what the presumption against extraterritoriality has always done. It's looked at the location of the relevant conduct. That's the statute's focus. So in that scenario, without taking into account what the property was, the injury would occur in California where the conduct happened. Your friend says – has emphasized that there's conduct all over the world, conduct in London, conduct in Lichtenstein. What is it about your presentation that makes the conduct in California any stronger than conduct in London, Lichtenstein, other places? At least two things, Your Honor. First and primarily, the architect, the centerpiece, the organizer of this RICO scheme is in California. Second, while there is some foreign conduct, our chair Nabisco recognizes this can be appropriate, the heart of it, the core, the nerve center, the key acts of the RICO enterprise are in California. Again, intimidating California witnesses, signing false documents, submitting them to a California court. Mr. Yeghezarian is in contempt of the California court today and for the last two years for some of these same actions that are part of the RICO scheme. These are centered in California. In today's world, often conduct has effects overseas or has a full circle, but each one of these actions began in California, may or may not have had a secondary component abroad, but came back full circle to California because any foreign conduct was then used again by Mr. Yeghezarian in California to submit false documents to the U.S. court and otherwise avoid his – Would you agree that your test is harder to apply than your friend's? It might make more sense, but it sounds a lot harder to apply. I do agree that a test that is context-specific, as RJR recognized, is slightly harder to apply than a Bright Line test, but our cases tell us that, and history tells us that, while Bright Line rules may be desirable, they're not desirable when they violate precedent or the statute's text, and the Bright Line here does that. It also leads to absurd results, as was discussed with my friend, where a U.S. citizen living abroad may not be able to sue for a purely U.S. action. So while Bright Line rules are easier, this court has been doing – and other lower courts have been doing extraterritoriality analysis with a similar test that looks at conduct for decades now, and we have confidence that the courts can do it. Your argument is, in part, that the California judgment constitutes a property interest that is separate from the debt that was incurred as a result of the original fraud. That's correct, Your Honor. And would you agree with Mr. Levy that you couldn't collect on the judgment in Liechtenstein and then turn around and try to collect on the judgment in California? I do agree that we cannot recover the same sums twice. Because of this RICO scheme, we haven't recovered any of these sums. The whole reason this judgment, this debt, if you will, if you want to call it that, remains intangible is because of this very RICO scheme. And, yes, there are separate property rights that have came from the same debt. Doesn't it seem strange that you're collecting on the debt in Liechtenstein extinguishes the property interest in California that you're relying on? If you can only collect on this once. Your Honor, because of this scheme, we haven't been able to collect on it at all. No, I understand. But I interpret your argument, maybe I don't understand this aspect of your argument, to say, as I said at the beginning, that the California judgment is a separate property interest and that's a property interest in California. But if that would be extinguished by collecting on the debt in Liechtenstein, doesn't that seem odd? I don't believe so, Your Honor. Property interest can come and go. More importantly, the fact that parallel collection efforts can be undertaken, that was Congress's decision when adopting the New York Convention, and not just Congress. Of course, countries all over the world have adopted that. And that envisions parallel enforcement proceedings, for example, in Liechtenstein and the U.S. What if you were chasing the petitioner around the world, trying to collect in various places, and you got judgments all over the place? Those are all separate property interests. They are, Your Honor. And in that situation, that's kind of what we're doing here. We've been trying to chase this money anywhere we can find it. This RICO scheme has prevented it. That's why it's so important to look at the conduct. And this conduct here occurred in California. That gives us more certainty. What do you do about the common law rule and the difference between the first restatement and the second restatement, which your colleague on the other side discussed? Sure. First of all, we don't think that conflict of law principles are really applicable to where you cite or how you analyze domestic injury, given the long history of the presumption against extraterritoriality. Second, this issue of the timing of the first versus the second restatement, that was addressed at page 14 of our amicus brief. And the second restatement was actually approved in 1969. It didn't come into effect until 1971. What about the idea, and we've seen this with other restatements, as Justice Scalia pointed out, and you read some of them, they're not describing the law as it is, but the law as some people think it should be. Sure. We think that the restatement was describing the law as it is, as was recognized when talking to petitioners. These things don't happen overnight. Again, there were multiple drafts circulated before the final draft was adopted in 1969, one year before RICO. So if we are looking at the trend of the law or the state of the law, whatever we want to call it, to the extent the background law is relevant, it is look at the conduct, look at this multifactor test. It is not domicile only. Counsel, I want to follow up on the questions that Justices Kagan and Alito were asking you, just to make sure I understand your position. So Justice Alito is positing you're chasing this guy around the world, trying to collect the money that's owed you in this London award. Let's say that all of the conduct that you're charging as the RICO conspiracy now, let's say that that happens abroad, happens in Europe, and then he moves to California. You get the California judgment, but all he's doing now is just refusing to pay. He's not doing anything. But you do have a California judgment. Do you concede then that you would not be able to sue him, that the property injury wouldn't be here, or it's purely the California judgment enough, even though the conspiracy and all of the bad conduct happened abroad? California conduct is necessary to overcome the presumption against extraterritoriality. California conduct is present here. In the scenario you posed where the only California link is the California judgment, of course, that's not this case. Right, right. But answer the hypo. So the judgment itself is not enough. Then it would be odd, right? You could just go anywhere, get a judgment, and say, now I can sue. But you're agreeing with me. You're conceding the judgment would not be enough if all the conduct happened abroad. I do agree, Your Honor. The conduct's primary. The location of the judgment is secondary. So in your hypothetical, the judgment would not be enough. Thank you. And you connect that up to the text of the statute. How, again? I connect it twofold. One, to the text of the statute, which refers to business or property. That's why we have to look at the property. But, two, to the presumption against extraterritoriality. That's a long line of cases, again, going back to Morrison, through RJR Nabisco, that tells us conduct is the primary focus. So it's our precedent plus our statute that tells us to look at conduct first. But in this specific circumstance. It sounds like you have a better argument from precedent than from statutory text, right? The statutory text just says property. It's our precedent that suggests that we generally look to conduct. You are correct, Your Honor. The statutory text does not say injury. Well, excuse me, it does say injury. The statutory text does not say domestic injury. It does not say conduct. So you have to look at the two together. From our precedent, we get conduct. From our statute, which tells us how to apply that precedent in this specific situation, we get property. And then there's the question that the most relevant precedent is RJR, which seems to walk away from that conduct focus. I don't know that it did, Your Honor. I think it just didn't get there. In that case, it was stipulated that all the conduct and all the effects and all the injury was foreign. That case was purely foreign conduct. As we know, footnote 12 of RJR left open the question of if a foreign plaintiff can bring a RICO claim. We think today's the day to answer that question. RJR did reaffirm that the court must look at conduct that is the statute's focus. For Section 1964C, the conduct that is the statute's focus is the conduct causing the injury, again, informed by the property that was injured. I think you said in response to Justice Barrett that injury, just the judgment alone, injury to the property alone in California would not be enough. That's correct, Your Honor. And then I guess to follow up on Justice Kagan's point, I don't really see how that squares with the text of the statute. And I guess you're just bringing in our precedent to put a gloss on that. But if the injury to the property is what the text talks about, and you're saying the injury to the property is not enough, I don't know what you have. But I guess you're drawing strands from precedent. Well, Your Honor, if we're going to look at just the statutory text, it doesn't say anything about domestic injury as well. It just says injury. So in that hypothetical, there would be injury. It would just be abroad. And if we're looking only at the statute without any interpretive help from the precedent, then we don't have the domestic injury issue. But when you bring in the domestic injury requirement from precedent, you also have to look at where that came from and the concerns it was attempting to address. Is it because the injury you're talking about is the interference with the execution of the judgment? So in Justice Barrett's hypothetical where you just have a judgment and the person is just not paying, maybe there isn't really an injury to the property in the way the statute reads. Because the property is the judgment and the person is just not paying, but they're not doing anything to the judgment. Whereas the allegation here suggests that there are all kinds of conduct that was set up and orchestrated, and it's the racketeering conduct to injure or interfere with the execution of the judgment in an affirmative way. That's exactly right, Your Honor. And that's why you can't divorce conduct from property. That's why I struggled a bit with the hypothetical, because it's hard to determine, you know, the injury to property without figuring out what injured the property. An injury, you've got to have the cause to understand what actually happened and to apply, again, precedent interpreting the statute faithfully. Could you comment on the comedy question that was posed to Mr. Levy? But in doing that, let's change the facts and assume that both the plaintiff and the defendant here are British, so that presumably the debt could be collected in Britain. What would be the comedy implications there of allowing a RICO claim of this sort to go ahead in the United States? Well, Your Honor, I want to make sure I understand your hypothetical. I think you said both parties are British in the hypothetical. But if the conduct still occurred in the United States, we don't believe there is comedy issues. Comedy looks at issues, addresses regulation of foreign conduct, very similar to what the presumption of extraterritoriality does. So long as U.S. law is regulating U.S. conduct, we don't believe there is comedy issues, regardless of the citizenship of the parties. Well, what's involved here at base is this debt that arose from fraudulent conduct in Russia, right? That's where the original arbitration award came from? Okay. And I assume that your client does not feel that he could engage in judicial proceedings at this point in Russia? It's about locating assets and the assets we found, and about where the judgment debtor is. He's in the U.S. That's why that's kind of the current stage we're in at this point. Well, what I'm saying is when the underlying debt arose from conduct in a foreign country between two individuals who are citizens of that country, allowing efforts to collect on this to be adjudicated in a court in the United States under RICO would seem to present comedy concerns. And that's what I want you to address. The simple response in the case where there would be no difficulty with the legal system in the country where the debt arose would be, why don't they adjudicate this dispute in the courts of the country where all of this occurred and where they are citizens? I think I've got three responses to that, Your Honor. First, the debt at issue in this RICO case is not the debt from the real estate deal in Russia. It's not even the London award. It is a U.S. judgment. The New York Convention teaches us that a U.S. judgment confirming an arbitration award is the same as any other U.S. judgment. Second, that's a substantive issue for Congress. Congress has written the RICO statute. They have not carved out enforcement of foreign arbitration awards. Congress knows how to carve out RICO conduct, as they did when they went back and amended it to carve out securities fraud. And third, enforcement actions, again, Congress's decision, a policy judgment, they make the decision that you can take, Congress has made the decision that you can take a foreign arbitration award, bring it to the U.S. At the same time, you're also enforcing it elsewhere. But if I could clarify, really, you've admitted that you wouldn't have a case, except for all the alleged acts of fraud and so forth, that you say the other side has engaged in to hide assets and so make the judgment of the California court unenforceable. Is that correct? I mean, your whole theory is based not on anything that happened overseas, but based on all the kind of alleged fraud and hiding of assets that occurred here.  Absolutely correct, Your Honor. Our entire RICO case hinges on the RICO conspiracy that was created, coordinated, and carried out from California after the London Award was issued and after the U.S. enforcement action was filed. Well, and for that reason, you know, Justice Alito was asking about the relationship between the London Award and the money that you are entitled to because of the arbitration abroad versus the California judgment and whether you can double collect. But you probably can get treble damages distinct from, I assume that would be your answer, you know, because Justice Kagan just asked you about the conduct that was here. That's a distinct RICO claim, the illegal shenanigans and fraud that happened in California to hide assets. So I assume your answer would be that you have a cause of action for which you can get treble damages that's unrelated to whatever underlying debt you're owed from the arbitration, or am I not following? I think I agree, Your Honor. There is a RICO claim that is based on separate and independent action that came after the arbitration order was issued. The question of damages, that's a substantive issue, a merits issue. We're at the standing stage. Additionally, you know, we've heard some policy arguments that treble damages shouldn't be available in a case like this. Again, Congress can carve out enforcement actions, carve enforcement actions out of RICO if it wishes to do so. But we're talking about distinct acts that occurred after entry of the arbitration order. That's my question about the distinctness of this as opposed to the award that you received in London. It's getting at different conduct, different things, different injuries. Absolutely right. And as to the damages piece, it's not as simple as I get three times my judgment. I've got to, just like any other RICO case, prove proximate causation, prove a damages theory. But again, that's an issue that the courts will sort through upon remand. And that's not a threshold standing issue, which is what we're here today for. Well, do you think that the availability of treble damages under RICO is an answer to the comedy concern that might be expressed? Or do you think it is a basis for the comedy concern that might be expressed? That has been something that's been prominently cited, if my memory serves me correctly, in other cases where foreign nations have filed briefs here in extraterritoriality cases and have said our legal system provides just compensation for just relief for the conduct that occurred within our borders that is alleged here. And it violates principles of comedy to allow that to be adjudicated under the U.S. legal system, which is very unlike that of most other countries in the world in allowing such a thing as treble damages under a statute like the RICO statute. I agree with you that the U.S. legal system and RICO treble damages are unique, Justice Alito. One, I would say there has been no foreign amicus briefs here as in the other extraterritoriality cases. Two, that is because we're not talking about foreign conduct here. We're talking about domestic conduct. And three, that's why I don't think we get to the prescriptive comedy issue, because we're talking about stuff that happened in the U.S. We're not regulating conduct in foreign countries. We are regulating U.S. conduct. And again, this gets us back to why it's so important to focus on conduct, because it avoids comedy concerns. It avoids regulating foreign conduct. Mr. Smoggin is the victim of a RICO enterprise led by an international fugitive living in Beverly Hills. That criminal created, coordinated, and carried out his scheme from California instead of a Russian prison. He was held in contempt of the U.S. court two years ago for some of these same RICO violations here, and he remains in contempt today. He's shown a complete disdain for the U.S. justice system and the judgment it issued. And his RICO enterprise has protected him from the consequences of that action. As we've talked about, domestic injury focuses on the relevant conduct informed by the location of the relevant property. Mr. Smoggin states a RICO claim because he alleged injury to his California judgment from California property. We believe the opinion below should be affirmed. Thank you, counsel. Justice Thomas? Justice Alito? Justice Sotomayor? Justice Kagan? Justice Smith? Justice Kavanaugh? Justice Barrett? Justice Jackson? Thank you, counsel. Mr. Levy, rebuttal. Thank you. My friends agree that RICO covers economic injury alone, and they have to. The text of the statute so says. It's been interpreted in that way starting from Chattanooga Foundry, the time the Sherman Act was enacted, and again through cases such as Ryder, which relied on Chattanooga Foundry to interpret the antitrust laws in 1979 in an agency holding. There's also no dispute that the first restatement rule would cite the injury at the plaintiff's domicile in the event of an economic injury. That is the end of the analysis. It's a bright-eyed rule. It's not perfect. But Epigran, RJR, and other presidents of this Court instruct that it is preferred in this context, and Congress is, of course, free to revise it as it did in Aramco, where the Court excluded a U.S. citizen from abroad from invoking Title VII. And Congress thereafter went back and said what it wanted to happen, which it hadn't clearly said before. My friends repeatedly say that the focus here is conduct. RJR said that it was the injury. This is not a new concept. We cite the great Alabama case from 1898, an Alabama decision, interpreting an Alabama state statute, and it says that in that case concerned negligent conduct that occurred in Alabama and an injury in Tennessee, and it said that read into the statute is a presumption that the statute covers only injuries in Alabama, and for injuries in Mississippi, you have to look to the state law in Mississippi. The injury here occurred at the domicile of the plaintiff. There's a reference to, of course, the judgment and where the judgment is located. There is a U.S. judgment. It does not only exist in California. It can be brought elsewhere in the United States. It can be brought and recognized across the world. There's a 20-year limitation period for recognizing judgments and for enforcing them. They have rights to enforce that judgment, but it can be brought everywhere in the world and replicated, and that is the issue, and that is why the common law cites it at the place of the creditor, not the debtor. It is enforceable everywhere by the creditor. It can be sold and brought to auction elsewhere, and in Texas v. New Jersey, the Court was focusing on citing debts for purposes of achievement, rejected a multifactor test that was proposed by one of the parties based on jurisdictional precedent, rejected the notion that it should look to the domicile of the debtor, because that would have the odd result of changing, turning a liability into looking at where a liability exists to cite the asset. What we're talking about here is citing the asset. The judgment is enforceable everywhere, and indeed, it is currently sought to be enforced in Lichtenstein, where there are enforcement proceedings. There's a proceeding in Monaco and related to the assets that are at the bank to determine the lawful owner of the assets. None of this is the basis for a RICO claim. None of this provides a basis for a foreign plaintiff with a foreign judgment to create an injury here by seeking to have it recognized here. Thank you, counsel. The case is submitted.